# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TIBURON LOCKERS, INC.** : <br>     **Plaintiff,** : <br> : <br> **v.** : <br> : <br> **NORTHGATE DIGITAL** : <br> **CORPORATION** : <br>     **Defendant.** : | **CIVIL ACTION NO. 15-5050** |

## MEMORANDUM OPINION

**Rufe, J.**                                         **February 5, 2018**

    Plaintiff Tiburon Lockers, Inc. and Defendant Northgate Digital Corporation entered into a contract whereby Northgate agreed to build a technology platform for Tiburon's business of providing lockers at public venues for storing and charging electronic devices. Tiburon filed suit alleging that Northgate failed to complete the contracted-for work and seeks the return of the money it paid to Northgate. Northgate argues that the parties' contract required Tiburon to object in writing when the work was delivered in two-week intervals called "sprints" and that the failure to do so bars recovery, and seeks payment for the work it completed after Tiburon stopped paying. The parties have filed cross-motions for summary judgment. For the following reasons, Northgate's motion will be granted as to Tiburon's claim, and Tiburon's motion will be denied.

**I.**    **BACKGROUND**

    As will be discussed, the parties dispute many facts concerning the interpretation of, performance under, and termination of the relevant agreements. The existence of the relevant contractual documents, at least, is not in contention. After Northgate submitted a response to Tiburon's detailed request for proposal stating that it could perform the necessary work for a

maximum of $224,500, the parties entered into a Master Services Agreement ("MSA"), executed on July 31, 2014, which incorporated by reference an agreed-upon Statement of Work ("SOW"). Critically for this litigation, the parties agreed in the SOW that "[i]n addition to the terms of the [SOW], the project deliverables will be guaranteed to Tiburon in two-week increments according to the email agreement from July 30, 2014 (Exhibit B). The guarantee in Exhibit B will prevail if it is in conflict with any terms in the [MSA or SOW]."[1] The July 30, 2014 email (Exhibit B), from Northgate to Tiburon, had proposed that:

> Northgate works in two-week sprints, with deliverables to you every two weeks. . . . At the end of each sprint, if we don't make the deliverables or you don't like them for any reason, you could either decide to terminate the contract and get your money back for the sprint...Or you could choose to let us put in extra time (at no extra charge) to finish the deliverables for that sprint and continue working."
>
> That way, you're not spending money for something you can't use, not going more than two weeks without ensuring we're on-schedule, but also Northgate is not taking on an unacceptable level of risk[.][2]

The MSA also addressed deliverables, providing in relevant part:

> 2.1 **Delivery of Services**
> By executing a Service Level Agreement or Statement of Work, Client agrees to take and pay for (i) the development costs and Services outlined in the Service Level Agreement or Statement of Work, and (ii) any services requested by Client on a "one-off" basis ("Supplemental Services") where such services are not included within the Statement of Works(s) [*sic*]. Client agrees to pay Northgate Digital the fees charged by Northgate Digital for Supplemental Services, and hereby authorizes Northgate Digital to perform such services on its behalf upon request by Client. ALL PROFESSIONAL SERVICES ARE PROVIDED ON AN "AS IS" BASIS AND EXCLUDE WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED in accordance with Northgate Digital's current policies and prices.

---

[1] Lowenthal Decl. Ex. D at 25 § 8.

[2] Def. Ex. 3 [Doc. 39-1] at 1-2 (second ellipses in original).

2.2 **Acceptance of Deliverables**
Pursuant to a Service Level Agreement or Statement of Work executed by both parties, Northgate Digital may complete all or portions of the Services requested, and shall provide the resulting deliverables to Client to review for compliance with the applicable Statement of Work. Such deliverables shall be deemed accepted by Client unless Client has provided written notice within twenty-eight (28) days of receipt of the deliverables that such deliverables materially fail to meet the specifications in the Statement of Work. Any such objection notice shall include a detailed description of (i) the grounds for the objection, and (ii) all changes requested by the Client for such portions to comply with the specifications in the applicable Statement of Work. Northgate Digital and Client agree to cooperate in good faith to resolve such objection, provided that in the event Client's objection to the deliverables is based upon matters not covered in the applicable Statement of Work, Northgate Digital may deem such objection to be a Request for Change, hereunder. In no event shall any delay in delivery by Northgate Digital associated with or resulting from a Request for Change relieve or suspend Client's obligations to pay Northgate Digital under section 3 of this Agreement or any Statement of Work executed pursuant to this Agreement.[3]

The SOW stated that "[a] prototype/demo version of the system is planned for October, 2014 with new builds containing incremental improvements delivered every two weeks. The final production-ready release is planned for November, 2014."[4] There is evidence that the parties had agreed that this was a compressed timeline, and the cost was higher for that reason.[5] Northgate affirmed in the SOW "its abilities to execute the project in the timelines referenced and to a quality standard as to be agreeable to the average person."[6]

Work by Northgate on the project proceeded for approximately 27 weeks, until February 23, 2015, when Northgate sent a termination letter to Tiburon, citing Tiburon's failure to make

---

[3] Lowenthal Decl. Ex. C. The MSA required that Tiburon would "continu[e] to pay in advance" for Northgate's services. *Id.* at § 3.2.

[4] Lowenthal Decl. Ex. D at 2 (emphasis omitted). The SOW also stated that "[t]he system will be developed in stages starting with an initial product launch in November, 2014." *Id.* at 17.

[5] Lowenthal Decl. at ¶¶ 15-18; Ex. J.

[6] Lowenthal Decl. Ex. D. at 25, ¶ 6.

required payments.[7] At that time Tiburon had paid $174,000 under the contract plus an additional $22,950 for supplemental work outside the agreed-upon scope.[8] Northgate contends that $8,666 was owed at the time of termination.

Tiburon then filed suit, alleging claims for breach of contract, fraud, and unjust enrichment. The Court granted Northgate's motion to dismiss as to the latter two claims, but held that the breach of contract claim could proceed, because "at this stage of the litigation, the Court cannot determine as a matter of law whether Northgate completed each sprint in accordance with the parties' agreement or whether the alleged failure to complete the work properly was or could have been known to Tiburon before Northgate allegedly failed to deliver a complete working platform, or if Northgate was required to do so."[9] The parties now seek summary judgment on this remaining claim.

## II. LEGAL STANDARD

"The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[10] A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive]

---

[7] Def. Ex. 7.

[8] Def. Exs. 8-9.

[9] Order of June 13, 2016 at n. 1 [Doc. No. 17].

[10] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[11] Fed. R. Civ. P. 56(a).

law."[12] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[13]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[14] Further, a court may not weigh the evidence or make credibility determinations.[15] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[16] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[17] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[18]

The rule is no different where there are cross-motions for summary judgment.[19] As stated by the Third Circuit, "[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."[20]

---

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[13] *Id.*

[14] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[15] *Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

[16] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[17] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[18] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[19] *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

[20] *Id.* (internal quotation omitted).

## III. DISCUSSION

Under Pennsylvania law, which the parties agree governs here, a cause of action for breach of contract requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."[21] "Issues of contractual interpretation are questions of law."[22] Contracts are to be interpreted according to the parties' intent, and where "a written contract is clear and unambiguous, the parties' intent is contained in the writing itself."[23] "In ruling on the motions for summary judgment, the Court is guided by the following points:

> (1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous: (2) each party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.[24]

### A. The Notice Requirement

Northgate takes the position that the SOW, MSA, and the email, taken together, required Tiburon to object in writing within 28 days after Northgate produced a deliverable in a completed sprint in order to receive a refund or to cause Northgate to fix what was wrong. Because Tiburon never objected to the work performed, Northgate argues that Tiburon accepted the work and cannot receive a refund. Northgate also argues that the work was performed in

---

[21] *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004) (internal quotation marks and brackets omitted).

[22] *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015).

[23] *Id.* (citing *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006); *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (1986)).

[24] *Bohler-Uddeholm Am., Inc. v. Elwood Grp., Inc.*, 247 F.3d 79, 94-95 (3d Cir. 2001) (footnote omitted).

accordance with the parties' agreements and that Tiburon was able to monitor the project's progress. Tiburon argues that the work was not performed as agreed, that the sprints were merely measurements of time, that it was the actual provision of deliverables that was critical to the parties, and that Tiburon could determine whether to wait and see whether the deliverable would be completed.

The agreements, read together, are not ambiguous. The parties expressly agreed that at the end of each sprint Tiburon could either terminate the contract and receive a refund for the latest sprint or allow Northgate to cure any defect in the work.[25] Tiburon's argument that it could take an unlimited wait-and-see approach contradicts both the language of the July 30, 2014 email and the provision in the MSA that deliverables would be deemed accepted unless written notice was provided within 28 days. Although Tiburon argues that the work was not performed in clear two-week sprints and deliverables were often not provided, Northgate has produced documents showing the sprints and the status of the work during the course of the project.[26] If there were a question of exactly when the notice had to be received, there might be a disputed question of material fact. However, Tiburon could not simply do nothing (or, as it says, "wait and see") for many months and then demand the return of money paid.[27] Tiburon is bound by its decision unless it can show some reason why it was unable to comply.

---

[25] "At the end of each sprint, if we don't make the deliverables or you don't like them for any reason, you could either decide to terminate the contract and get your money back for the sprint...Or you could choose to let us put in extra time (at no extra charge) to finish the deliverables for that sprint and continue working." Def. Ex. 3 [Doc. 39-1] at 1-2 (second ellipses in original).

[26] *See*, e.g., Def. Exs. 11, 12.

[27] The July 30, 2014 email expressly stated that the purpose of proceeding in two-week sprints was so that Tiburon was "not spending money for something you can't use" and Northgate was not "taking on an unacceptable level of risk." Tiburon's interpretation does not support that purpose.

## B. Assessing the Status of the Project

Tiburon essentially argues that it could not accurately assess the status of the project and therefore could not give notice. The SOW provided for "frequent communications between the programmers and Tiburon to ensure the system [was developed] in alignment with the [client's] business requirements" through the use of a "Project Queue," a "master list" that showed what was to occur during each two-week sprint, as revised over the course of the project.[28] The SOW described this as Northgate's "Agile methodology for system development" based upon "short, two-week iterations known as sprints."[29] Northgate agreed to provide Tiburon access to the Project Queue through a web portal that would include the tracking of all defects and issues with the project, and to hold morning status meeting conference calls.[30] The evidence shows that these provisions were carried out, that the parties were in frequent communication, and that Tiburon had the opportunity to test software as it was developed.[31] Although Tiburon argues that it received misleading or incomplete status assessments from Northgate, Tiburon has not produced evidence from which a reasonable fact-finder could conclude that Tiburon was unable to assess the status of the project as it was proceeding.[32] Therefore, Tiburon's failure to provide the required notice while the work was being performed bars recovery.[33]

---

[28] Lowenthal Decl. Ex. D at 13.

[29] *Id.* (internal quotation marks omitted).

[30] *Id*. at 15.

[31] *See, e.g.*, Def. Ex. 18 (email of January 29, 2015) in which John Fisher of Tiburon reported that he had tested a unit and that it "worked perfectly by weighing the lockers at random."

[32] Tiburon has submitted the declaration of its software engineer, Jianyun ("June") Gao, who joined Tiburon in August 2015 (after the end of the Tiburon-Northgate relationship), but who has reviewed the data

### C. Northgate's Counterclaim

Northgate seeks recovery of $8,666 that it claims was owed at the time the agreement was terminated. However, as it did not seek summary judgment on the counterclaim until filing its reply brief, the motion will be denied as to the counterclaim.

## IV. CONCLUSION

For the reasons stated above, Northgate's motion for summary judgment will be granted as to Tiburon's affirmative claim and denied as to Northgate's counterclaim. Tiburon's cross-motion will be denied. An order will be entered.

---

provided by Northgate. According to Gao, Northgate "created the illusion that many deliverables had been completed when, in fact, they had not been completed," and that "the underlying code was either completely missing or incomplete." Gao Decl. at ¶¶ 7-8. However, the declaration does not establish that Tiburon could not have made these determinations while the work was being performed.

[33] The notice requirement would have allowed either termination of the contract or an opportunity for Northgate to cure any defects. "Pennsylvania law allows a party to ignore a right-to-cure provision only if 'there is a material breach of the contract so serious it goes directly to the heart and essence of the contract, rendering the breach incurable.'" *Apacheta Corp. v. Lincare, Inc.,* No. 16-2030, 2017 WL 5901085, at * 3 (E.D. Pa. Nov. 30, 2017) (quoting *LJL Transp., Inc., v. Pilot Air Freight Corp.*, 962 A.2d 639, 641 (Pa. 2009) ). The evidence must support a finding of the kind of disloyal and dishonest conduct that "is so fundamentally destructive, it understandably and inevitably causes the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate." *LJL Transp., Inc.*, 962 A.2d at 652. There is no such evidence in this case.